Good morning, Your Honors. Carried the veto for Appellant James Grady. Your Honors, after the briefing was completed in this matter, I filed a motion for leave to expand the excerpts of record to include a jury instruction from the State Court form. Excuse me, if I could interrupt. That's not a microphone there, that's a recorder, so you'll have to keep your voice up. I'm sorry, Your Honor, I thought I was. Your Honors, I have filed a motion to expand the jury instruction from the State Court trial, and the motions panel deferred it to this panel for consideration. I wanted to talk about that jury instruction today, and I'm not sure if I'm allowed to without you having ruled on my motion. In essence, the instruction tells the jury or told the jury in this State trial that whether or not some instructions applied depended on what that jury found to be the facts, and that the jury was to disregard any instruction which applied to facts determined by it not to exist. The reason I'm bringing that instruction to the Court's attention is because in this case, of course, there's a dispute about whether the two contradictory jury instructions affected the outcome of this case. And I think this, the jury instruction I'm asking the Court to add to the excerpts of record goes directly to that dispute, because if the jury decided facts didn't exist to give Calgic 4.21, which was the correct instruction, the only other instruction that existed in the record that guided them in how to determine what used to make of evidence of Mr. Grady's voluntary intoxication was Calgic 4.20, and it's been conceded at all levels that it was error to give that instruction. Well, speaking of all levels, the California Court of Appeals said it was error to give it, but then said it was harmless. Yes. Okay. And so the only issue before us is whether they were unreasonable in saying it was right or even clearly wrong, but unreasonable. Correct. Okay. So why? Objectively unreasonable, I think, is the term the Court uses, which is a fairly substantial burden, far more, as Judge Silberman points out, than a direct appeal. So your argument would be more helpful to us if you can focus on that. Yes, Your Honor. In Strickland, the Court phrased the test as whether or not or whether there's a reasonable probability that an outcome would have been different absent trial counsel's errors. And in Strickland, the Court further defined reasonable probability as a probability sufficient to undermine confidence in the outcome. So I believe the question this Court's going to be facing is whether there is an undermining of confidence in the outcome because of the state of the record juxtaposed against the erroneous instruction. I believe the opening brief addressed that rather in detail. I set out, I think, five factors looking at the record overall, looking at the state of the record overall. How could this instruction have misled the jury? Everything from what other instructions existed to guide the jury in the right direction. Well, there was really only one. Two, did counsel's arguments overcome the error of the instruction? Counsel's arguments might have, but the jury also was confusingly instructed, albeit correctly under California law, that counsel's arguments were not evidence and the jury was supposed to focus solely on the evidence. And then again, the state of the record, although it's not before the Court as discrete issues on appeal, there were errors in the admission of evidence in this case in that evidence about Mr. Grady's prior bad acts, prior convictions, prior lawsuits. That isn't really before us, is it? The COA did not give you permission on that, only on the jury instruction. No, Your Honor, it didn't. But I was relying on Estelle v. McGuire when that Court said when you look at the jury instruction, you have to look at the overall state of the record. I'm simply saying when we look at the state of the record, whether or not it was an error or a mistake to allow that evidence in, that evidence came in. Well, if you look at the overall state of the record, you know, when you're assessing the error, I think a strong argument can be made that the evidence against Grady was overwhelming. His own detailed statement as to what he did was the strongest evidence against Grady. So it's not just any diminished responsibility as he did as to what he did. Your Honor, there's never been any question that Mr. Grady committed this homicide. The only question at trial and now is what level of homicide was it. Was it a premeditated murder or a murder with simply malice or manslaughter? Well, didn't he admit he didn't he his by his own admission, he didn't blame his actions on voluntary intoxication. Your Honor, he might not have blamed his actions on voluntary intoxication, but I'm simply submitting to the Court as a layperson, he might not have understood that that was a defense to the greater crime, a murder crime as opposed to a manslaughter crime. He also might not have been in the best position to judge whether or not he was impaired. The only evidence we have of whether or not he was intoxicated by rock cocaine was his confession, right? That's all we have. There were other witnesses who testified that all of them, all the people in the room that night had been using cocaine. And of course, there was an autopsy that showed the victim had been using cocaine as well. That the victim was. Now, tell me what evidence it was. I've read the entire transcript of of what he said happened. And I have tagged here every time he mentions cocaine. So I'm fairly well acquainted with that part. His evidence was that he wanted to engage in sex and that this fellow was going to provide the woman to give oral sex based upon bringing cocaine. And then he points out in here how little involvement he had in cocaine. And it strikes me that if you only have this, I'd be surprised if you'd be even entitled to a jury instruction on intoxication. What other evidence was there that was presented as to his ingestion of cocaine? Your Honor, there were two other witnesses, two people in the room, one of whom was the woman who was supposed to provide sex. Those other witnesses were Harris and Washington. And at some point in the trial record, both of them testified that there had been cocaine use among at least Mr. Washington, I believe, didn't use cocaine, but said he saw the others using it. There had been cocaine used. But we have no evidence about the amount of cocaine. No evidence as to the amount. And by his own admission, he said that he was not intoxicated by it, that he had an effect. And he testifies that that it was it was Lenny who was smoking the cocaine, his cocaine that he gave him so that he could have this sexual encounter on two occasions. And then the fight got into how much cocaine that was provided to the lady for the involvement. If there's nothing more than that, there doesn't seem to be much evidence that he was intoxicated at all by cocaine. So if that's true, it'd be very difficult to prove. It seems to me it'd be very difficult to prove that the court was objectively unreasonable in finding lack of prejudice. How do you respond to that? Well, Your Honor, there was an expert. Well, let me back up a minute. Mr. Grady wasn't arrested for this crime until sometime after it occurred, so there was certainly no opportunity for him to be arrested and tested for his level of intoxication shortly after the offense. Because it was a mental state defense, I believe the trial court looked at the entire record and concluded there was a sufficient quantum of evidence to give the correct instruction. Well, didn't he say something like it might have affected his logic and reason, something to that effect? Yes. Yes, Your Honor, he did. And the defense did call an expert witness who, of course, had no personal knowledge of what happened that night, but who was able to testify in generalities about how cocaine affects people. I believe the jury was able to look at this evidence and infer or by inference conclude because of the ferocity of the attack, there might have been some kind of cocaine-fueled paranoia, which is what the expert spoke about. But other than those things, no, there is no other evidence in the record I'm aware of. Well, he also, you know, I mean, there were also the issues of that the jury obviously decided against him, I guess, but he, about whether, what, the robbery occurred before or after, how that factored into the decision, correct? Well, that was his defense. Yeah, because there was stuff that was stolen, too. And his defense to the robbery charge was that he formed the intent to steal after he had already committed the homicide. And then what did the jury decide? What did the jury decide? We have to assume the jury disbelieved him because they convicted him of the robbery as well. Right. And so then it's – then doesn't that make it a felony murder then, too? But, Your Honor, the defense in this case, once again, was a mental state defense that because of voluntary intoxication, he was unable to actually form the intent. Did the jury properly understand that? Because whether or not he stole at the time he was committing the murder or decided I'm going to steal this at the time he was committing the murder, if he was so intoxicated he couldn't form the intent to commit a malice-based homicide, there would not have been a felony murder, whether or not there was a robbery. Because the murder intent is separate from the robbery intent. Does the Court have any other questions? I'll reserve the rest of my time for rebuttal. Thank you, Ms. Guido. Good morning. May it please the Court, Deputy Attorney General Matthew Mulford for the Warden. I'd like to take a step back, actually, and address the propriety of Instruction 4.20 on a constitutional basis. This instruction was conceded to be here and found by an heir of the state court because it violates the California Supreme Court's holding that the instruction should not be given in this kind of case. But the Court did so under an exercise of its supervisory power and not on a constitutional basis. So when there's a concession of heir in the record and a finding of heir for the state court, they did so on state law grounds, not on constitutional grounds. So I want to make that, to emphasize that point. So when the Court actually considered the instructions as given under the totality of the circumstances under the constitutional test, which is Boyd v. California, the Court found that, in fact, there was no constitutional heir. Judge Silliman said, I'm not aware of saying that they found the heir in giving this state law instruction was harmless. So to begin with, we really don't have anything that really would have confused the jurors under the constitutional standard. Of course, had counsel requested the instruction under state law, he was entitled to it, but the prejudice of asking for this instruction is really nonexistent. As a matter of constitutional law. And so then we get to the subsidiary issue of whether the jurors could have been confused by an ambiguous instruction, which is the reason the California Supreme Court originally said we should not give instruction. The evidence, the arguments of counsel, emphatically suggest no. There is no problem here. The evidence of first degree murder is almost overwhelming. There are 28 different stab wounds. He broke a bottle over the poor man's head. He suffocated him with a pillow. And so even if there may not have been overwhelming evidence of premeditation and deliberation in the days or hours before the crime, during the crime, he certainly had time to form that mental state. Well, it took him a while to die, didn't it? I'm sorry. He didn't die right away, did he? I don't believe so. I mean, he had to then do the pillow and then didn't he have to break his neck too? That's correct. He stepped on him with his foot and hurt his neck stab. He took his shoes off to prevent him from trying to kick into the window, to prevent the neighbors from hearing him. So this was a prolonged and relatively savage beating that resulted in death. I'm sorry, Judge Hall. You can see that if he was, in fact, fully intoxicated by cocaine usage, that there might be a difference in the outcome of this case? That is, suppose it was proven by any doubt, beyond any doubt, that he was fully intoxicated. Difficult question to answer, primarily because full intoxication for cocaine, I think, is a very unknowable state. I ask you to assume it. I didn't ask you to take it. Assuming he was fully intoxicated to the point where he could really not think. Yes. Then that would be a problem. There'd be a problem because he may not have the intent. You could only get him for manslaughter or there may be some other difficulties are involved. So the issue is, as far as prejudice is concerned, is could the jury have, along with that intoxication, been concerned with the second jury instruction, which tells them, at least in part, or at least they could assume, I understand your take on it, on it in Red 15, but they could assume that maybe he has an excuse if there's intoxication. What I'm asking is, is your argument based upon the amount of intake of cocaine? I think that certainly helps our argument in that there is very little evidence that there was substantial ingestion of cocaine. I think the only statement, as you asked my opposing counsel. And how would your argument be different if it were otherwise? That is, if there was enough in the record that the jury could have believed that he was fully intoxicated by ingestion of cocaine. Well, I hate to hedge on this, but the first aspect was that 4.20, if applied in a strictly and technical legal sense, is not air. In that the jurors would not have found that he did an act that was criminal, i.e. murder, without also considering the effect of his assumed intoxication from cocaine in figuring whether or not he had the mens rea. Well, I mean, clearly, if the level of intoxication was that great, I think that would have to be factored into the prejudice of giving 4.20, don't you think? It's probably a factor we could consider. As a matter of constitutional law, the giving of 4.20 was not air. Jurors who applied it technically, literally, and perhaps if they knew the difference between an affirmative defense, you know, It wasn't constitutional air because it was harmless, right? And it's less likely to be harmless if it's more likely to be prejudicial. And it certainly would be more likely to be prejudicial if he was totally loaded on cocaine and couldn't think. I think I have to disagree with the first premise in the question that the harmlessness of the instruction. I'm not sure if the Boyd test talks about errors in instruction. It talks about instructions that are ambiguous and then whether there's a reasonable likelihood that the jurors misapplied them. So at worst with these instructions, that's where we are. So I hate to nitpick, but we're talking about a State law error, but it's not constitutional error. I really think we're done. Does it matter? I mean, I'm not sure why it matters if it's constitutional error or not. We're talking about ineffective assistance of counsel. So if he made a tactical error, even if it's not constitutional, if it's tactical and prejudicial, we have ineffective assistance of counsel. It doesn't matter that the error is constitutional or not. I disagree. I don't think we can have prejudice if the instruction was not prejudicial. Say he blows it, say he blows a deadline. And as a result, his client is prejudiced in some way. That's not a constitutional error in blowing a deadline, but nevertheless would be the predicate for ineffective assistance of counsel. I see the point. Addressing the prejudice aspect of the instruction, there is extremely little evidence that this person, Mr. Grady's, intoxication level was significantly high enough to even warrant giving the instruction. Well, that brings me to the quotation that I asked Ms. DeVito about. Wasn't there evidence that he says, I'm not blaming it on cocaine, but I'm sure it had a little part in it as far as inaudible, your logic and your reason? I mean, isn't he saying that it affected his judgment on that day? Isn't that enough to put this in play? Under California law, no. If his statement was such that I was high on cocaine such that I did not know what I was doing, could not think, was walking unconscious. If his statement suggested that level of intoxication, that would. But that's not the standard for whether a judge has to give a jury instruction. It is, correct. It's not the standard for giving the jury instruction. It is the standard for relieving the element of malice of forethought for first-degree murder. So when we talk about voluntary intoxication affecting your mental state, it is a substantial impairment. It is not just a little bit. And so if Mr. Grady, a week after the crime, can recall in pretty significant detail what he did and can tell a police officer that I wasn't that high, essentially, I'm paraphrasing, of course, that is not sufficient under California law to negate a first-degree murder to a manslaughter. And again, I guess I should finish. I haven't mentioned it yet, of course, that we're dealing with this under the AEDPA. The state court already went through all these things, already made its determination of error and harmlessness, to use their terms, and state law instruction error, and the boy tests as to whether this was prejudicial, and its decision is not unreasonable. Roberts. Thank you, Mr. Welker. Ms. DeVito. Thank you, Your Honors. Judge Wallace, you had asked me about the state of the record with regard to evidence of how intoxicated Mr. Grady was. And again, there really isn't anything in the record to give us an actual level of what that intoxication was. But I had mentioned to you that an expert had been called, and I just wanted to repeat that from the brief what the expert had said about what an extreme level of cocaine ingestion can show. The expert testified that heavy use of cocaine can cause paranoia, bordering on psychosis, and cocaine is an adrenaline booster, so that a person under the influence of cocaine can show unusual strength and also display violent behavior toward others. And that appears in the State Reporters' Transcripts in Volume 1 at pages 161 to 162 and 226 to 227. That was the cross-examination of the government's expert. It was the pathologist's testimony, so I assume, yes, the cross-examination of a prostitution. And it was based upon what could happen, and I assume that's true. But the question is, did it happen? And in this case, he denies that he is intoxicated, although he says he was influenced. And then he says, I don't have a cocaine habit. He said he doesn't have a habit. I'm not sure how much the hypothetical that was given to the expert, how that ties into the facts of this case.  Absolutely, Your Honor. I think most drug addicts are going to be in denial about the level of their drug dependency. And I think that's exactly what was going on here. And I believe the probation report reflects that, because clearly Mr. Grady was a drug abuser. But with respect to the actual facts at this case, in this trial, the facts were that there was a vicious and prolonged attack on the victim. Your Honor, you mentioned 27, I think, stab wounds? Twenty-eight. Twenty-eight stab wounds. No matter how Mr. Grady might have wanted to minimize his behavior to the police, the jury would look at the ferocity of that attack and then take in this pathologist's testimony and said, a normal human being acting on his own, no matter how fearful he is for his life, reasonably or unreasonably, is not going to stab somebody 28 times and smother them and do this almost Rasputin-type series of homicidal acts towards someone. Well, unfortunately, I'd like to agree with that, but when you've seen a lot of homicide cases, it's not, you know, most of the people aren't, it's not like what a normal person would do. And people don't always cooperate and die really quickly. And so it, you know, that's what the jury has to look at all of that. So, I mean, those are all arguments that you can make to a jury. But I don't know that, you know, we can take, like, judicial notice of any that a normal human being wouldn't do that. It would have to be an, you know, an enraged cocaine abuser. We don't know how this, we don't know what this jury was thinking or what their thought process was. I'm simply saying that based on those facts of the kind of attack this was and the different kinds of homicidal acts that were committed against this victim, the jury could have looked at that and then taken this pathologist's testimony and said, oh, a reasonable interpretation of this evidence is that he was under the influence of cocaine. I suppose if your adversary were given a chance to argue again, which he won't be, he would say, but look what happened right after. He was he had his competency enough to search, ransack the house, get a clean bar of soap and wash himself off, which was rather strange. Take the safe out, but be smart enough to put a sheet around it before he put it in the back of the car. And then was wise enough to take the scissors along and then dispose of them on the freeway and then take the car and sell the tires and the wheels, which indicates that that there were some faculties going there. How would you respond to that when when we don't know how much cocaine he's ingested, only he's ingested some. And then he has these very rational acts that occur after a very irrational murder. Your Honor, the problem are the holes in this record. And I don't know if that was the fault of trial counsel. With hindsight, I can't say it was ineffective assistance to fail to fill in those holes. But one of the things I'd be curious to know is how quickly does a cocaine intoxication wear off? We know how quickly an alcohol intoxication wears off, at least I do because I've read it in transcripts. Every hour or so it decreases by half in the body. Can someone be so fueled by cocaine and paranoia that they commit a murder and within half an hour act rationally? I submit to you that's a possibility, that Mr. Grady was not able to actually form the mental state that he was going to kill this man at the time he killed him. But immediately after the homicide, he came to his senses, he was frightened by what he did, and yet he decided to be opportunistic about it and ransack the house and make a clean getaway. That's a possibility. I don't know if that was really before the jury. I suppose it's part of what they considered because his behavior immediately afterward, as you said, was somewhat rational. Maybe they could take that into consideration in determining whether he was intoxicated enough to be able to take advantage of counsel. In the case of the California court, the defense attorney argued the case as if the proper jury instruction had been given to the jury rather than the incorrect. That is, not only the defense attorney, but the prosecution argued the case as if the proper jury instruction had been given. What weight should we place on that in determining whether the ruling by the California court was objectively reasonable in finding no prejudice? First, Your Honor, the jury was also instructed, again, that the arguments of counsel were not evidence. They were simply supposed to shed light on the evidence, and the jury could disregard counsel's argument. We don't know whether they did or didn't. Secondly, the opening brief pointed out that even if the jury correctly understood that Caljic 421 was the instruction they were to apply, if you look at Caljic 420, it's so ambiguous when used in juxtaposition with the one immediately after it, that the jury could be told they had to determine whether or not Mr. Grady actually formed this mental state, and yet going back to 420, they're told, but that doesn't relieve him of responsibility. So they could have applied 421 correctly based on the arguments of counsel, and yet still not given him the benefit of it based on 420. I'm sorry? I mean, were there any juror questions? No. Not on that instruction. And both the prosecution and the defense argued the correct instruction, correct? Yes. I mean, they focused the jury on, okay, this is what the evidence is, and this end the prosecutor said this is why he's not entitled to any reduced charge and wasn't diminished, and the defense argued this is why he is. Yes, correct. There's a U.S. Supreme Court case, Francis v. Franklin. I mentioned that in the opening briefs as well. If the Court would look at page 28 of that case, a similar situation occurred. Contradictory instructions were given, and the jury wasn't told which one carried more weight. And the Supreme Court was concerned – I'm sorry, it's 471 U.S. at page 322 is the exact quote I'm bringing to the Court's attention. The U.S. Supreme Court said a reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict. And that's really the problem here. Notwithstanding the fact that trial counsel and the prosecutor may have highlighted the correct instruction for the jury, we really have no way of knowing which one, which one of the two, the jury applied here. And because of that, there is harmful prejudice to Mr. Grady requiring reversal of his conviction and a writ of habeas corpus. Does the Court have any questions? I don't think so. Thank you, Ms. DeVito. Mr. Mulford, thank you. The case to charge is submitted. Thank you.
judges: Wallace, Silverman, Callahan